UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

DEANNA ALVES :
:
v. : C.A. No. 14-229S
:
CAROLYN W. COLVIN :
Commissioner of the Social Security :
Administration :

**REPORT AND RECOMMENDATION**

Lincoln D. Almond, United States Magistrate Judge

This matter is before the Court for judicial review of a final decision of the Commissioner of the Social Security Administration ("Commissioner") denying Supplemental Security Income ("SSI") benefits under the Social Security Act (the "Act"), 42 U.S.C. § 405(g). Plaintiff filed her Complaint on May 13, 2014 seeking to reverse the decision of the Commissioner. On January 30, 2015, Plaintiff filed a Motion to Reverse Without or, Alternatively, With a Remand for a Rehearing the Commissioner's Final Decision. (Document No. 10). On April 1, 2015, the Commissioner filed a Motion for an Order Affirming the Decision of the Commissioner. (Document No. 12). No reply brief was filed by Plaintiff.

This matter has been referred to me for preliminary review, findings and recommended disposition. 28 U.S.C. § 636(b)(1)(B); LR Cv 72. Based upon my review of the record, the parties' submissions and independent research, I find that there is not substantial evidence in this record to support the Commissioner's decision and findings that Plaintiff is not disabled within the meaning of the Act. Consequently, I recommend that the Commissioner's Motion for an Order Affirming the Decision of the Commissioner (Document No. 12) be DENIED and that Plaintiff's Motion to Reverse Without or,

Alternatively, With a Remand for a Rehearing the Commissioner's Final Decision (Document No. 10) be GRANTED.

## I. PROCEDURAL HISTORY

Plaintiff filed an application for SSI[1] on August 16, 2011 alleging disability since September 1, 2009. (Tr. 164-172). Plaintiff alleges an intellectual disability which was formerly known as mild retardation and that she also suffers from a separate learning disorder as well as a mood disorder and post-traumatic stress disorder "(PTSD"). (Document No. 10 at p. 4). The application was denied initially on September 17, 2011 (Tr. 104-106) and on reconsideration on December 2, 2011. (Tr. 107-109). Plaintiff requested an Administrative hearing. On January 2, 2013, a hearing was held before Administrative Law Judge Jason Mastrangelo (the "ALJ") at which time Plaintiff, represented by counsel, and a vocational expert ("VE") appeared and testified. (Tr. 35-77). The ALJ issued an unfavorable decision to Plaintiff on January 23, 2013. (Tr. 14-29). The Appeals Council denied Plaintiff's Request for Review on March 14, 2014, therefore the ALJ's decision became final. (Tr. 1-3). A timely appeal was then filed with this Court.

## II. THE PARTIES' POSITIONS

Plaintiff argues that the ALJ erred by not finding her to be disabled under Listing 12.05(c). In particular, Plaintiff alleges that the ALJ misevaluated the medical evidence and should have found that her mental impairments, in addition to her intellectual disability, were "severe" impairments.

The Commissioner disputes Plaintiff's claims and asserts that the ALJ properly evaluated the medical evidence and substantial evidence supports his Step 3 finding that Plaintiff did not meet the requirements of Listing 12.05(c).

---

[1] According to Plaintiff's brief, she filed a subsequent application for SSI benefits which was approved at the initial stage of the evaluation process. (Document No. 10 at p. 3). The Commissioner did not dispute this assertion in her brief.

### III. THE STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla – i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. Ortiz v. Sec'y of Health and Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam); Rodriguez v. Sec'y of Health and Human Servs., 647 F.2d 218, 222 (1st Cir. 1981).

Where the Commissioner's decision is supported by substantial evidence, the court must affirm, even if the court would have reached a contrary result as finder of fact. Rodriguez Pagan v. Sec'y of Health and Human Servs., 819 F.2d 1, 3 (1st Cir. 1987); Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991). The court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. Frustaglia v. Sec'y of Health and Human Servs., 829 F.2d 192, 195 (1st Cir. 1987); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied).

The court must reverse the ALJ's decision on plenary review, however, if the ALJ applies incorrect law, or if the ALJ fails to provide the court with sufficient reasoning to determine that he or she properly applied the law. Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam); accord Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991). Remand is unnecessary where all of the essential evidence was before the Appeals Council when it denied review, and the evidence establishes without any doubt that the claimant was disabled. Seavey v. Barnhart, 276 F.3d 1, 11 (1st Cir. 2001) citing, Mowery v. Heckler, 771 F.2d 966, 973 (6th Cir. 1985).

The court may remand a case to the Commissioner for a rehearing under sentence four of 42 U.S.C. § 405(g); under sentence six of 42 U.S.C. § 405(g); or under both sentences. Seavey, 276 F.3d at 8. To

remand under sentence four, the court must either find that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim. Id.; accord Brenem v. Harris, 621 F.2d 688, 690 (5th Cir. 1980) (remand appropriate where record was insufficient to affirm, but also was insufficient for district court to find claimant disabled).

Where the court cannot discern the basis for the Commissioner's decision, a sentence-four remand may be appropriate to allow her to explain the basis for her decision. Freeman v. Barnhart, 274 F.3d 606, 609-610 (1st Cir. 2001). On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence. Diorio v. Heckler, 721 F.2d 726, 729 (11th Cir. 1983) (necessary for ALJ on remand to consider psychiatric report tendered to Appeals Council). After a sentence four remand, the court enters a final and appealable judgment immediately, and thus loses jurisdiction. Freeman, 274 F.3d at 610.

In contrast, sentence six of 42 U.S.C. § 405(g) provides:

> The court...may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding;

42 U.S.C. § 405(g). To remand under sentence six, the claimant must establish: (1) that there is new, non-cumulative evidence; (2) that the evidence is material, relevant and probative so that there is a reasonable possibility that it would change the administrative result; and (3) there is good cause for failure to submit the evidence at the administrative level. See Jackson v. Chater, 99 F.3d 1086, 1090-1092 (11th Cir. 1996).

A sentence six remand may be warranted, even in the absence of an error by the Commissioner, if new, material evidence becomes available to the claimant. Id. With a sentence six remand, the parties must return to the court after remand to file modified findings of fact. Id. The court retains jurisdiction pending remand, and does not enter a final judgment until after the completion of remand proceedings. Id.

**IV. THE LAW**

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505. The impairment must be severe, making the claimant unable to do her previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

### A. Treating Physicians

Substantial weight should be given to the opinion, diagnosis and medical evidence of a treating physician unless there is good cause to do otherwise. See Rohrberg v. Apfel, 26 F. Supp. 2d 303, 311 (D. Mass. 1998); 20 C.F.R. § 404.1527(d). If a treating physician's opinion on the nature and severity of a claimant's impairments, is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. § 404.1527(d)(2). The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory. See Keating v. Sec'y of Health and Human Servs., 848 F.2d 271, 275-276 (1st Cir. 1988).

Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments. See Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir. 1986). When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on the (1) length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the medical evidence supporting the opinion; (4) consistency with the record as a whole; (5) specialization in the medical conditions at issue; and (6) other factors which tend to

support or contradict the opinion. 20 C.F.R § 404.1527(c). However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion. See 20 C.F.R. § 404.1527(c)(2).

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled. However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability. 20 C.F.R. § 404.1527(e). The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether the claimant meets a listed impairment, a claimant's residual functional capacity (see 20 C.F.R. §§ 404.1545 and 404.1546), or the application of vocational factors because that ultimate determination is the province of the Commissioner. 20 C.F.R. § 404.1527(e). See also Dudley v. Sec'y of Health and Human Servs., 816 F.2d 792, 794 (1st Cir. 1987).

### B. Developing the Record

The ALJ has a duty to fully and fairly develop the record. Heggarty v. Sullivan, 947 F.2d 990, 997 (1st Cir. 1991). The Commissioner also has a duty to notify a claimant of the statutory right to retained counsel at the social security hearing, and to solicit a knowing and voluntary waiver of that right if counsel is not retained. See 42 U.S.C. § 406; Evangelista v. Sec'y of Health and Human Servs., 826 F.2d 136, 142 (1st Cir. 1987). The obligation to fully and fairly develop the record exists if a claimant has waived the right to retained counsel, and even if the claimant is represented by counsel. Id. However, where an unrepresented claimant has not waived the right to retained counsel, the ALJ's obligation to develop a full and fair record rises to a special duty. See Heggarty, 947 F.2d at 997, citing Currier v. Sec'y of Health Educ. and Welfare, 612 F.2d 594, 598 (1st Cir. 1980).

### C. Medical Tests and Examinations

The ALJ is required to order additional medical tests and exams only when a claimant's medical sources do not give sufficient medical evidence about an impairment to determine whether the claimant is

disabled. 20 C.F.R. § 416.917; see also Conley v. Bowen, 781 F.2d 143, 146 (8th Cir. 1986). In fulfilling his duty to conduct a full and fair inquiry, the ALJ is not required to order a consultative examination unless the record establishes that such an examination is necessary to enable the ALJ to render an informed decision. Carrillo Marin v. Sec'y of Health and Human Servs., 758 F.2d 14, 17 (1st Cir. 1985).

### D. The Five-step Evaluation

The ALJ must follow five steps in evaluating a claim of disability. See 20 C.F.R. §§ 404.1520, 416.920. First, if a claimant is working at a substantial gainful activity, she is not disabled. 20 C.F.R. § 404.1520(b). Second, if a claimant does not have any impairment or combination of impairments which significantly limit her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled. 20 C.F.R. § 404.1520(c). Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled. 20 C.F.R. § 404.1520(d). Fourth, if a claimant's impairments do not prevent her from doing past relevant work, she is not disabled. 20 C.F.R. § 404.1520(e). Fifth, if a claimant's impairments (considering her residual functional capacity, age, education, and past work) prevent her from doing other work that exists in the national economy, then she is disabled. 20 C.F.R. § 404.1520(f). Significantly, the claimant bears the burden of proof at steps one through four, but the Commissioner bears the burden at step five. Wells v. Barnhart, 267 F. Supp. 2d 138, 144 (D. Mass. 2003) (five-step process applies to both SSDI and SSI claims).

In determining whether a claimant's physical and mental impairments are sufficiently severe, the ALJ must consider the combined effect of all of the claimant's impairments, and must consider any medically severe combination of impairments throughout the disability determination process. 42 U.S.C. § 423(d)(2)(B). Accordingly, the ALJ must make specific and well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled. Davis v. Shalala, 985 F.2d 528, 534 (11th Cir. 1993).

The claimant bears the ultimate burden of proving the existence of a disability as defined by the Social Security Act. Seavey, 276 F.3d at 5. The claimant must prove disability on or before the last day of her insured status for the purposes of disability benefits. Deblois v. Sec'y of Health and Human Servs., 686 F.2d 76 (1st Cir. 1982), 42 U.S.C. §§ 416(i)(3), 423(a), (c). If a claimant becomes disabled after she has lost insured status, her claim for disability benefits must be denied despite her disability. Id.

### E. Other Work

Once the ALJ finds that a claimant cannot return to her prior work, the burden of proof shifts to the Commissioner to establish that the claimant could perform other work that exists in the national economy. Seavey, 276 F.3d at 5. In determining whether the Commissioner has met this burden, the ALJ must develop a full record regarding the vocational opportunities available to a claimant. Allen v. Sullivan, 880 F.2d 1200, 1201 (11th Cir. 1989). This burden may sometimes be met through exclusive reliance on the Medical-Vocational Guidelines (the "grids"). Seavey, 276 F.3d at 5. Exclusive reliance on the "grids" is appropriate where the claimant suffers primarily from an exertional impairment, without significant non-exertional factors. Id.; see also Heckler v. Campbell, 461 U.S. 458, 103 S. Ct. 1952, 76 L.Ed.2d 66 (1983) (exclusive reliance on the grids is appropriate in cases involving only exertional impairments, impairments which place limits on an individual's ability to meet job strength requirements).

Exclusive reliance is not appropriate when a claimant is unable to perform a full range of work at a given residual functional level or when a claimant has a non-exertional impairment that significantly limits basic work skills. Nguyen, 172 F.3d at 36. In almost all of such cases, the Commissioner's burden can be met only through the use of a vocational expert. Heggarty, 947 F.2d at 996. It is only when the claimant can clearly do unlimited types of work at a given residual functional level that it is unnecessary to call a vocational expert to establish whether the claimant can perform work which exists in the national economy. See Ferguson v. Schweiker, 641 F.2d 243, 248 (5th Cir. 1981). In any event, the ALJ must make a specific

finding as to whether the non-exertional limitations are severe enough to preclude a wide range of employment at the given work capacity level indicated by the exertional limitations.

### 1. Pain

"Pain can constitute a significant non-exertional impairment." Nguyen, 172 F.3d at 36. Congress has determined that a claimant will not be considered disabled unless he furnishes medical and other evidence (e.g., medical signs and laboratory findings) showing the existence of a medical impairment which could reasonably be expected to produce the pain or symptoms alleged. 42 U.S.C. § 423(d)(5)(A). The ALJ must consider all of a claimant's statements about his symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence. 20 C.F.R. § 404.1528. In determining whether the medical signs and laboratory findings show medical impairments which reasonably could be expected to produce the pain alleged, the ALJ must apply the First Circuit's six-part pain analysis and consider the following factors:

(1) The nature, location, onset, duration, frequency, radiation, and intensity of any pain;

(2) Precipitating and aggravating factors (e.g., movement, activity, environmental conditions);

(3) Type, dosage, effectiveness, and adverse side-effects of any pain medication;

(4) Treatment, other than medication, for relief of pain;

(5) Functional restrictions; and

(6) The claimant's daily activities.

Avery v. Sec'y of Health and Human Servs., 797 F.2d 19, 29 (1st Cir. 1986). An individual's statement as to pain is not, by itself, conclusive of disability. 42 U.S.C. § 423(d)(5)(A).

### 2. Credibility

Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding. Rohrberg, 26 F. Supp. 2d at 309. A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record. See Frustaglia, 829 F.2d at 195. The failure to articulate the reasons for discrediting subjective pain testimony requires that the testimony be accepted as true. See DaRosa v. Sec'y of Health and Human Servs., 803 F.2d 24 (1st Cir. 1986).

A lack of a sufficiently explicit credibility finding becomes a ground for remand when credibility is critical to the outcome of the case. See Smallwood v. Schweiker, 681 F.2d 1349, 1352 (11th Cir. 1982). If proof of disability is based on subjective evidence and a credibility determination is, therefore, critical to the decision, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding." Foote v. Chater, 67 F.3d 1553, 1562 (11th Cir. 1995) (quoting Tieniber v. Heckler, 720 F.2d 1251, 1255 (11th Cir. 1983)).

## V.  APPLICATION AND ANALYSIS

Plaintiff was twenty-three years old on the date of the ALJ's decision. Plaintiff has a high school education, having received significant services and accommodations through special education. (Tr. 330). Plaintiff has no past relevant work. (Tr. 27).

On September 5, 2009, Plaintiff underwent a Learning Disability/Vocational Appraisal with Robert Cherella, MA, CAGS, an Educational/Vocational Consultant. (Tr. 315-320). Plaintiff reported a history of educational difficulties and special education services while in school. (Tr. 315). She stated that she enjoyed going on the computer, surfing the Internet, having "a nice group of friends," and babysitting for family members and friends on occasion. Id. On mental status examination, Plaintiff did not display any severe psychopathology though she reported having a bad temper, getting frustrated easily, being agitated and irritable often and having frequent dramatic mood swings. (Tr. 316). During testing, Plaintiff had

some difficulty understanding, following and remembering the instructions and directions given to her. Id. On Wechsler Adult Intelligence Testing, Plaintiff obtained a full-scale IQ score of 68, a perceptual reasoning score of 71, a processing speed score of 72, a verbal comprehension score of 68 and a working memory score of 68. (Tr. 317). Mr. Cherella suggested diagnoses of learning disorder, mood disorder and mild mental retardation. (Tr. 320).

In connection with her prior SSI application, Plaintiff was referred by State disability determination services to Psychologist Sol Pittenger, Ph.D., for a consultative psychological examination on January 9, 2010. (Tr. 328-331). Plaintiff described a pattern of depressed mood, with sporadic anger or depression in the context of family and interpersonal difficulties. (Tr. 328). Dr. Pittenger acknowledged previous testing that yielded intelligence scores "towards the upper limit of the mild mental retardation range" and noted that Plaintiff's "presentation during the current interview is consistent with this finding." (Tr. 329). Plaintiff described activities including driving a car, preparing meals independently, assisting with cleaning chores, cleaning her own room, shopping independently, spending time with family and friends, going on her computer and babysitting; she thought she would be able to plan a menu and purchase appropriate food items for it. Id.

Plaintiff described some difficulty with concentration when reading; on formal assessment, her concentration appeared to be below average but consistent with her cognitive level. (Tr. 330). On mental status examination, Plaintiff was friendly and cooperative, though she described her mood as frequently angry. Id. Her intelligence appeared to be in the upper limit of the mild mental retardation range; her concentration and fund of information were diminished, her insight and judgment appeared fair, she had some difficulty understanding more complex interview questions, and Dr. Pittenger felt that she did not appear capable of managing any benefits she might be due. Id. Dr. Pittenger assessed adjustment disorder with depressed mood and mild mental retardation and estimated her global assessment of functioning ("GAF") at 46, within the 41-50 range indicative of "some impairment in reality testing or

communication...OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." (Tr. 331).

On January 15, 2010, State agency reviewing Psychologist J. Stephen Clifford reviewed Plaintiff's records to date in connection with her prior SSI application and completed a Psychiatric Review Technique Form (Tr. 337-348) and Mental Residual Functional Capacity Assessment form. (Tr. 333-335). The records Dr. Clifford reviewed included Mr. Cherella's and Dr. Pittenger's examination reports. (Tr. 335). Dr. Clifford acknowledged diagnoses of mild mental retardation, a learning disorder, a mood disorder, and adjustment disorder, but stated that Plaintiff's "[m]ild mood d/o [disorder] does not appear to impose any significant functional limitations (Claimant does not meet 12.05C listing)." Id. Dr. Clifford stated that Plaintiff could follow, understand and remember simple directions, though she could not follow complex directions; she could complete a normal eight-hour workday, and she could accept supervision and cooperation with co-workers. Id. Dr. Clifford assessed medically determinable mental impairments of learning disorder, mental retardation and mood disorder (Tr. 338, 340, 341), but further stated that Plaintiff "may have a mild mood d/o but this does not appear to interfere with social functioning (and does not impose any additional restrictions)." (Tr. 335).

Plaintiff saw Tirza Goncalves, a social worker, on June 17, 2010 reporting that she was "stressed." (Tr. 356-358). Discussion focused on Plaintiff's relational conflicts with her parents and peers. (Tr. 356). On mental status examination, Plaintiff's appearance was appropriate, she was fully oriented, her behavior and psychomotor behaviors were unremarkable, her affect was appropriate, her mood was mildly anxious and depressed, her memory was intact, her intellect was described as average, her attitude was cooperative, her attention was maintained, her reasoning and impulse control were fair as were her judgment and insight, her self-perception was realistic, her thought processes were logical, and her thought content was unremarkable. (Tr. 356-357). Ms. Goncalves assessed an adjustment disorder with mixed anxiety and depression, mild occupational problems, and a GAF of 65, in the 61-70 range indicative of "some mild

symptoms...OR some difficulty in social, occupational, or school functioning...but generally functioning pretty well, has some meaningful interpersonal relationships." (Tr. 357). Plaintiff saw Ms. Goncalves again on July 30, 2010 on which date discussion focused on family stressors and relational conflict. (Tr. 359-361). Ms. Goncalves' findings on mental status examination, as well as her clinical assessments, were the same as during Plaintiff's prior visit. (Tr. 359-360).

Plaintiff was referred by State disability determination services to another consultative psychological evaluation with William Unger, Ph.D., on September 6, 2011. (Tr. 364-369). Plaintiff reported a history of academic difficulties and special education services, as well as suspensions for arguing with teachers, fighting with other students and truancy. (Tr. 365). Her activities of daily living included attending school Monday through Thursday mornings in a medical assistant program, cleaning her room and occasionally cooking and helping with laundry. (Tr. 366). She had a valid driver's license, but was unable to count money and could not manage her own bills or funds. Id. She watched television; listened to music and went on the computer, visiting Facebook and YouTube sites. Id. On mental status examination, Plaintiff was alert, oriented and calm; there was no evidence of a formal thought disorder; her insight and judgment were fair; her attention and concentration were variable; and she denied chronic symptoms of a mood disorder or an anxiety disorder. (Tr. 367). Plaintiff obtained a score of 28 on the Mini-Mental Status Examination. Id. There was no evidence of PTSD, panic disorder, agoraphobia or obsessive-compulsive disorder. Id. On formal psychological testing, Plaintiff was friendly, cooperative and motivated; she worked steadily on assigned tasks; her frustration tolerance was adequate; she tended to be impulsive; and her reaction time was within normal limits. Id. Intelligence testing yielded a full scale IQ score of 67, a verbal comprehension score of 68, a perceptual reasoning score of 73, a working memory score of 66, and a processing speed score of 64. Id. Dr. Unger diagnosed mild mental retardation, but did not diagnose any adjustment, anxiety or mood disorder. (Tr. 369). He assessed Plaintiff's GAF at 48 currently and during the previous year. Id.

Another State agency consultant reviewing psychologist, Michael Slavit, Ph.D., reviewed Plaintiff's updated records on September 10, 2011 and assessed Plaintiff with one severe mental impairment, borderline intellectual functioning. (Tr. 81). Dr. Slavit acknowledged Dr. Unger's diagnosis of mild mental retardation, stating that "Unger's diagnosis of mild MR is not accepted, as claimant is in school for medical assisting, scored 28/30 on the MMSE [mini-mental status examination], has a driver's licence and as the Field Office stated 'no limitations observed.'" (Tr. 82, referencing Tr. 213, 367). Dr. Slavit assessed Plaintiff with the mental residual functional capacity ("RFC") for 3-step, concrete instructions; non-complex tasks; and sustaining an eight-hour schedule in two-hour blocks at routine tasks. (Tr. 84). Dr. Slavit noted that Plaintiff "has no mood or anxiety issues that would impose limitations," in light of Dr. Unger's report of no problems with frustration tolerance; no findings of severe psychopathology and no mood, anxiety, or personality disorder. (Tr. 84). Finally, Dr. Slavit noted that "even if [Dr. Unger's] dx of mild MR were accepted, there are no other psych issues imposing restrictions, and the MRFC would be the same." (Tr. 84).

In connection with Plaintiff's request for reconsideration of the initial denial of her current SSI application, another State agency reviewing psychologist, Jeffrey Hughes, Ph.D., reviewed Plaintiff's updated record on December 1, 2011. (Tr. 88-94). Dr. Hughes also assessed only one severe mental impairment, borderline intellectual functioning. (Tr. 91). His conclusions as to Plaintiff's mental RFC mirrored those of Dr. Slavit's. (Tr. 92-94).

Plaintiff returned to Ms. Goncalves on October 4, 2011, after a year's absence, reporting that her anxiety symptoms, including fearful thoughts, excessive worry, and hypervigilance, began to increase following a shooting incident. (Tr. 415). Plaintiff was spending most of her time at home, with decreased energy, irritability, feelings of hopelessness and difficulty concentrating and focusing. Id. On mental status examination, Plaintiff's appearance was appropriate, she was fully oriented, her behaviors and psychomotor behaviors were unremarkable, her speech and affect was appropriate, her mood was anxious

and depressed, her intellect was average, her attitude was cooperative, her attention was maintained, her reasoning and impulse control were fair, as were her judgment and insight, and her self-perception was realistic. (Tr. 415-416). Ms. Goncalves assessed adjustment disorder with mixed anxiety and depression, mild educational and occupational problems, and a GAF of 58, in the 51-60 range indicative of "moderate symptoms...OR moderate difficulty in social, occupational, or school functioning." (Tr. 416). Ms. Goncalves subsequently noted similar observations on mental status examination, and assessed the same diagnoses and similar GAF scores, after seeing Plaintiff on October 27, 2011, (Tr. 412-413), November 17, 2011 (Tr. 409-410) and December 12, 2011. (Tr. 406-407).

Plaintiff's counsel referred her to psychologist Jorge Armesto, Ph.D., for a clinical diagnostic interview on August 23, 2012. (Tr. 443-440). Plaintiff reported graduating from high school while receiving special education services. (Tr. 434). She had been involved in a shooting incident the prior year where she was in a car that was shot at in Providence.[2] (Tr. 434, 438). Since then she reported that she did not go out much, but felt more comfortable when accompanied in the community. (Tr. 434). She stated she had a driver's license, but that she had "road rage problems" in that she yelled and beeped at people. Id. She argued frequently with her parents; she slammed doors, punched walls and threw things. (Tr. 434-435). Dr. Armesto administered intelligence testing, which yielded a full-scale IQ score of 52, a verbal comprehension score of 63, a perceptual reasoning score of 54, a working memory score of 50 and a processing speed score of 68. (Tr. 435-436). On mental status examination, Plaintiff presented with good behavioral control and sat through the interview without difficulty during testing, she was easily distracted with poor concentration and several subtest instructions had to be repeated several times. (Tr. 438). Dr. Armesto diagnosed PTSD, mood disorder, and mild mental retardation and assessed a GAF of 44. (Tr.

---

[2] At the ALJ hearing, Plaintiff testified that she was a passenger in a car that was shot at in June of 2011 and that a boy in the car she was in returned fire in "self defense." (Tr. 55). Plaintiff indicated that she did not know the boy she was with had a gun and that the shooting was "because we are from the east side and they're from the south side." (Tr. 56).

439). Dr. Armesto acknowledged the conflict between the IQ scores Plaintiff obtained in his testing and those she previously obtained with Dr. Unger, but hypothesized that this was due to "increased anxiety and emotional dysregulation associated with Post-Traumatic Stress Disorder Claimant currently experiences." Id.

On December 12, 2012, Ms. Goncalves completed an Emotional Impairment Questionnaire form indicating diagnoses of PTSD and mood disorder, with moderate to severe symptoms. (Tr. 461). Ms. Goncalves felt that Plaintiff could not sustain competitive employment on a full-time, ongoing basis. (Tr. 462). Ms. Goncalves also completed a Supplemental Questionnaire As To Residual Functional Capacity indicating that Plaintiff had moderate restrictions in her activities of daily living and ability to understand, carry out, and remember simple instructions; she further indicated moderately severe limitations in several areas, such as social functioning, attention and concentration in a work setting, and the abilities to respond appropriately to supervision, co-workers and the general public. (Tr. 463).

### A. The ALJ's Decision

The ALJ decided this case adverse to Plaintiff at Step 5. At Step 2, the ALJ found that Plaintiff's borderline intellectual functioning/mild mental retardation and learning disability were "severe" impairments pursuant to 20 C.F.R. § 416.921. (Tr. 20). He did not, however, find that any of Plaintiff's other mental impairments, including PTSD, were severe impairments. Id. At Step 3, the ALJ found that Plaintiff did not meet Listing 12.05(c) (intellectual disability) because her other mental impairments imposed only mild restrictions. (Tr. 23). As to RFC, the ALJ found that Plaintiff was moderately impaired as to her concentration and attendance to tasks and would be unable to perform any tasks requiring higher than a fifth grade reading and second grade math level. (Tr. 25). Based on this RFC and the VE's opinion, the ALJ found that Plaintiff could perform various unskilled jobs and therefore was not disabled under the Act. (Tr. 28).

### B. The ALJ Did Not Properly Consider Plaintiff's PTSD

It is undisputed that Plaintiff suffers from an intellectual disability formerly known as mild mental retardation. Under Listing 12.05(c), Plaintiff is considered per se disabled if, in addition to her intellectual disability, she has another "mental impairment imposing an additional and significant work-related limitation of function."

Here, all of the consulting and non-examining reports relied upon by the ALJ in making his decision pre-date any mention of PTSD in the record including by Ms. Goncalves, Plaintiff's treating therapist, or Dr. Armesto, a consulting psychologist retained by Plaintiff in 2012.

Plaintiff testified that the shooting incident took place in June of 2011. On October 4, 2011, Plaintiff resumed therapy with Ms. Goncalves and reported increasing anxiety and other symptoms following the shooting incident. (Tr. 415). Ms. Goncalves noted similar complaints from Plaintiff in subsequent sessions through December 12, 2011. (Tr. 406-413). In an emotional impairment questionnaire completed on December 12, 2012, Ms. Goncalves reports that Plaintiff suffers from PTSD and that her symptoms are "nightmares, flashbacks, anger, avoidance, depressed mood, racing thoughts and auditory hallucinations." (Tr. 461-464). Also, on August 23, 2012, Dr. Armesto opined that Plaintiff suffered from PTSD and further observed as follows regarding the shooting incident:

> Claimant indicated that because of this traumatic event, she is hypervigilant, has nightmares and intrusive thoughts about the event. She also reported avoiding the areas in the city associated with the shooting. During testing, Claimant also presented as an individual who has marked difficulties sustaining attention (e.g., this examiner had to repeat testing instructions). Although Claimant's current WAIS-4 test scores are significantly lower than those scores from previous testing, this writer opines that this discrepancy is likely due to increased anxiety and emotional dysregulation associated with Post-Traumatic Stress Claimant currently experiences.

(Tr. 439).

The ALJ gave minimal probative weight to the assessments of Ms. Goncalves and Dr. Armesto because they were inconsistent with the record. However, since Plaintiff first reported increasing

symptoms due to the shooting incident in October 2011, none of the other consulting and reviewing psychologists considered those symptoms or the presence of PTSD in evaluating Plaintiff.[3] Thus, the assessments of Ms. Goncalves and Dr. Armesto are necessarily inconsistent in this regard. Furthermore, Dr. Armesto specifically explained that his findings differed somewhat from Dr. Unger's because of the PTSD symptoms experienced by Plaintiff after she was evaluated by Dr. Unger. (Tr. 439). However, the ALJ fails to mention, much less evaluate, Dr. Armesto's explanation or that the treatment records reflect a worsening of Plaintiff's symptoms in 2011 and 2012. The ALJ primarily relied upon assessments that predated the alleged deterioration of Plaintiff's condition due to PTSD and, thus, absent a medical advisor's or consultant's assessment of the full record, the ALJ effectively substituted his own lay judgment for the medical opinions of Ms. Goncalves and Dr. Armesto. See Alcantara v. Astrue, 257 Fed. Appx. 333, 2007 WL 4328148 (1st Cir. Dec. 12, 2007) (per curiam). Accordingly, the ALJ's findings as to Ms. Goncalves' and Dr. Armesto's assessments in the context of their PTSD diagnoses are not supported by substantial evidence and remand is warranted.

## VI. CONCLUSION

For the reasons discussed herein, I recommend that the Commissioner's Motion for an Order Affirming the Decision of the Commissioner (Document No. 12) be DENIED and that Plaintiff's Motion to Reverse Without or, Alternatively, With a Remand for a Rehearing the Commissioner's Final Decision (Document No. 10) be GRANTED. Further, I recommend that Final Judgment enter in favor of Plaintiff remanding this matter for further administrative proceedings consistent with this decision.

Any objection to this Report and Recommendation must be specific and must be filed with the Clerk of the Court within fourteen (14) days of its receipt. See Fed. R. Civ. P. 72(b); LR Cv 72. Failure

---

[3] Although Dr. Hughes rendered his reconsideration assessment on December 1, 2011 (Tr. 88-94), he does not mention the shooting incident and notes his understanding that Plaintiff was not alleging worsening of symptoms at reconsideration. (Tr. 91). There is also no indication that he reviewed Ms. Goncalves' treatment notes from October and November 2011. He does, however, reference the presence of "notes from BVCHC from 2010." Id.

to file specific objections in a timely manner constitutes waiver of the right to review by the District Court and the right to appeal the District Court's decision. See United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).


  /s/ Lincoln D. Almond
LINCOLN D. ALMOND
United States Magistrate Judge
April 22, 2015